**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
PHILIP MORRIS USA INC.,

                                          Plaintiff,                    **REPORT AND**
                                                                        **RECOMMENDATION**

                  - against -                                           CV 08-0068 (KAM) (JO)

U.S. SUN STAR TRADING, INC., et al.,
                                          Defendants.
---------------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

          In a complaint filed on May 7, 2008, plaintiff Philip Morris USA Inc. ("Philip Morris")

accused defendants U.S. Sun Star Trading, Inc. ("Sun Star") and its incorporator and alleged

alter-ego An Long Li ("Li") of importing cigarettes bearing bogus Philip Morris trademarks,

thereby violating state and federal law.  Docket Entry ("DE") 1 (the "Complaint").[1]  The

defendants have never responded, and the Clerk has noted the default of each.  Entry of Default

dated September 26, 2008; DE 49.  Philip Morris thereafter moved for a default judgment, DE

53, and the Honorable Kiyo A. Matsumoto, United States District Judge, referred the matter to

me for a report and recommendation.  Order dated October 23, 2009.  I now make my report and,

for the reasons set forth below, respectfully recommend that the court enter judgment finding the

defendants jointly and severally liable to Philip Morris on the Complaint's first six causes of

action in the total amount of $90,350 (consisting of $90,000 in statutory damages and $350 in

costs) and that it issue a permanent injunction; I further recommend that the court deny the

remainder of the motion and dismiss the Complaint's seventh and eighth causes of action,

alleging state law statutory claims of deceptive business practices and trademark infringement.

---

[1]  Philip Morris also named ten "John Doe" defendants in the Complaint, but has never identified
their true identities.  Except as noted, I exclude them from all references to the "defendants"
below.

I.     Background

The following recitation of facts is drawn from the Complaint's uncontested allegations and the uncontroverted documents submitted in support of the instant motion for default judgment.  Philip Morris owns federally registered trademarks that it uses in marketing its cigarettes and other products, including the "MARLBORO" trademark and the "Roof Design Label" trademark that appear on Marlboro cigarettes and other products (collectively, the "Marlboro Marks").  Defendant Sun Star is a New York corporation with its principal place of business in Brooklyn, New York.  Defendant Li is an individual residing in Brooklyn, New York.  Complaint ¶¶ 7-12 & Exs. A-B.

In September 2006, the U.S. Bureau of Customs and Border Protection ("CBP") investigated a shipment that Sun Star imported into the United States.  The bill of lading described the shipment's contents as frozen food products, but CBP discovered that it actually contained 3,950 cartons of cigarettes bearing the Marlboro brand.  CBP determined the cigarettes to be counterfeit.  *Id.* ¶¶ 14-15.  Philip Morris obtained samples from this shipment and confirmed that the cigarettes were indeed counterfeit.  *Id.* ¶¶ 14-16.

Philip Morris filed the Complaint on January 7, 2008, claiming that the defendants arranged for and imported the shipment as part of an ongoing scheme to import, distribute, and sell counterfeit cigarettes.  Philip Morris claimed this conduct caused a likelihood of consumer confusion, and consequently, loss of goodwill in the Marlboro Marks and of sales of its products.  In its first three causes of action, Philip Morris accused the defendants of violating the federal Lanham Act through trademark infringement, false designation of origin, and the importation of goods bearing infringing marks.  *See* 15 U.S.C. §§ 1114(1), 1125(a)(1)(A), 1124.  The fourth

cause of action asserted that the defendants violated the federal Tariff Act by unlawfully importing goods bearing registered U.S. trademarks. *See* 19 U.S.C. § 1526(a). The Complaint's remaining counts asserted violations of New York State law. The fifth and sixth claims asserted common law claims of unfair competition and trademark infringement, respectively; and the final two causes of action alleged that the defendants engaged in deceptive business practices as well as trademark infringement in violation of applicable statutes. *See* N.Y. Gen. Bus. Law §§ 349, 360-k *et seq*; Complaint ¶¶ 5-6, 17-18, 21-55.

Philip Morris served the Complaint on Sun Star on January 8, 2008. DE 35. After repeatedly attempting to serve Li at his last known business and residential addresses to no avail, I permitted Philip Morris to conduct expedited discovery in aid of service. DE 54 (Declaration of Sara K. Pildis in Support of Philip Morris USA Inc.'s Motion for Default Judgment and Order) ("Pildis Dec.") ¶¶ 4-5; DE 13. As part of that discovery, Philip Morris subpoenaed Xian Feng Zou ("Zou"), an attorney who had represented Li in a real estate transaction. At his deposition, Zou asserted the attorney-client privilege over any questions relating to Li's contact information. After I overruled his privilege assertions, Zou revealed that he had called Li and discussed the instant litigation and the plaintiff's subpoena of Zou, and that Li had subsequently visited Zou and given him $3,000 to assert the privilege. Pildis Dec. ¶¶ 5-8; DE 54-3.

Philip Morris also discovered additional shipping documents that contained representations apparently designed to conceal details of the defendants' location and operations. Specifically, the delivery address listed for Sun Star on the arrival notice corresponded to a small townhouse in a residential area of Queens, New York that had no facilities for the receipt of commercial shipments; and the telephone number listed for Sun Star corresponded to a pre-paid

3

cellular telephone account with no account holder information and no other information linking it to Sun Star. Pildis Dec. ¶ 12-13; DE 54-5; DE 54-6; DE 54-7. The documents further revealed that, in addition to the shipment seized in September 2006, Sun Star had imported another shipment a month earlier using the same description of food items in the bill of lading, the same contact information and delivery address for Sun Star, and the same freight forwarders and customs broker that were used in connection with the importation of the illicit cargo. *See* Pildis Dec. ¶ 16; DE 54-5 at 10, 15.

Philip Morris also asserts that the fax number listed for Sun Star on the shipping documents was registered to a company called Anlong No. 1, Inc. ("AN1") – and that AN1 belonged to defendant Li, with whom it shared a name. Moreover, Philip Morris asserts that Li terminated and disconnected AN1's fax number almost immediately after the September 2006 seizure. Pildis Dec. ¶ 13; DE 54-6.

Although the discovery I permitted revealed information about Li's connection to Sun Star, it did not yield further information about Li's whereabouts. I therefore permitted Philip Morris to effect alternate service on Li, delivering the Complaint to his known addresses, publishing a notice in several newspapers, and serving a copy on attorney Zou. Pildis Dec. ¶¶ 17-20; DE 42; DE 44. Philip Morris reported that it completed such alternate service on February 20, 2009. DE 44.

Neither Sun Star nor Li ever responded to the Complaint after being served. Pildis Dec. ¶¶ 3, 21. Philip Morris asked the Clerk to enter Sun Star's default on September 19, 2008, and the Clerk did so a week later. DE 36; Entry of Default dated September 26, 2008. On July 1,

2009, several months after effecting alternate service on Li, Philip Morris asked the Clerk to enter Li's default, and the Clerk likewise complied eight days later. DE 46; DE 49.

On September 24, 2009, Philip Morris filed the instant motion for default judgment. DE 53. In its motion papers, Philip Morris requested an award of monetary damages of $2,000,000 (a request based on infringement of two trademarks), as well as injunctive relief, and $350 in costs. DE 55 (Memorandum of Law in Support of Motion for Default Judgment) ("Memo.") at 10-25.[2] After the court referred the motion to me, I ordered Philip Morris to file any submission it wished to have me consider by November 16, 2009. In doing so, I explicitly stated that "[t]his will be the plaintiff's final opportunity to present argument or evidence in support of any request for relief" and I also explicitly gave the defendants an opportunity to respond to any such submission. DE 56. At my direction, Philip Morris served its motion and my order on Sun Star, but I excused similar service on Li in light of his prior efforts to avoid service of the Complaint. DE 57; Order dated October 29, 2009. Philip Morris filed its supplemental submission on November 16, 2009. DE 58.

II.    Discussion

A.    Default

When a defendant defaults, the court must accept as true all well-pleaded allegations in the complaint, except those pertaining to the amount of damages. Fed. R. Civ. P. 8(b)(6); *see Finkel v. Romanowicz*, 577 F.3d 79, 83 n.6 (2d Cir. 2009) (citing *Greyhound Exhibitgroup, Inc.*

---

[2]  The motion papers did not press the Complaint's requests for other forms of relief including attorneys' fees, prejudgment interest, and general and special damages. *Compare* Complaint at 14 (prayer for relief ¶ C) *with* Memo. at 10-25 *and* DE 54-12. I recommend that the court deem such requests to have been withdrawn, for reasons I explain below.

*v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)).  The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims:  a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading.  With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action.  *See, e.g.*, *Finkel*, 577 F.3d at 84; *Directv, Inc. v. Neznak*, 371 F. Supp. 2d 130, 132-33 (D. Conn. 2005) (denying default judgment on several claims based only on conclusory allegations which lacked a sufficient factual basis for a finding of liability); *see also Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971) (default-based liability is established by "well-pleaded allegations in a complaint"), *rev'd on other grounds*, 409 U.S. 363 (1973); *Greyhound Exhibitgroup*,973 F.2d at 159 (complaint's assertion of proximate cause necessary for finding of liability must be "properly alleged"); *Levesque v. Kelly Commc'ns, Inc.*, 1993 WL 22113, at *5 (S.D.N.Y. Jan. 25, 1993) ("the Court must be satisfied initially that the allegations of the complaint are 'well-pleaded") (citing *Trans World Airlines*, 449 F.2d at 63).

      If the defaulted complaint suffices to establish liability, the court must conduct an inquiry sufficient to establish damages to a "reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (quoting *Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)).  Detailed affidavits and other documentary evidence can suffice in lieu of an evidentiary hearing.  *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991); *Credit Lyonnais*, 183 F.3d at 155.  The plaintiffs have submitted the following evidence, in addition to the declaration from its counsel:  excerpts from

the deposition of Li's lawyer, DE 54-3; documents from the companies that shipped the cigarettes seized by CBP, DE 54-4; DE 54-5; copies of phone and fax registration documents for the numbers listed on the shipping forms, DE 54-6; DE 54-7; New York State documents setting the minimum retail price for cigarettes, DE 58-3; and an affidavit from a senior director at Philip Morris concerning pricing of its cigarettes, DE 58-4. The plaintiffs have had ample opportunity to put additional information before me but have chosen not to do so. Upon this record, I have declined to convene an evidentiary hearing and make the instant report and recommendation on the basis of the submitted documents. *Action S.A.*, 951 F.2d at 508; *Transatl. Marine Claims Agency*, 109 F.3d at 111.

      B.     <u>Liability</u>

            1.     <u>Sun Star</u>

                  a.     <u>Lanham Act</u>

The Lanham Act serves "to protect the holders of trademarks from the promotion and sale of competing products likely to confuse consumers as to their source." *Chanel, Inc. v. Xiao Feng Ye*, 2007 WL 2693850, at *2 (E.D.N.Y. Sept. 12, 2007) (citing *Tanning Research Labs., Inc. v. Worldwide Import & Export Corp.*, 803 F. Supp. 606, 608 (E.D.N.Y. 1992)); 15 U.S.C. §§ 1114, 1125. A plaintiff can prevail on a claim for either trademark infringement or false designation of origin if it can show that the plaintiff owns a valid trademark, and that the defendant's use of that trademark "is likely to cause confusion regarding the source of the product." *Rolex Watch U.S.A., Inc. v. Jones*, 2000 WL 1528263, at *2 (S.D.N.Y. Oct. 13, 2000) (citing *Time, Inc. v. Peterson Publ'g Co.*, 173 F.3d 113, 117 (2d Cir. 1999)).

Generally, courts evaluate the element of confusion by considering the eight "*Polaroid* factors." *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Those factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products in the marketplace; (4) the likelihood that the plaintiff will bridge the gap between the products (enter a market related to that in which the defendant sells its product); (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product; and (8) sophistication of the relevant consumer group. *Rolex*, 2000 WL 1528263, at *2 (citing *Polaroid*, 287 F.2d at 495).

However, in cases involving the use of counterfeit marks, "the Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion." *Philip Morris USA Inc. v. Marlboro Express*, 2005 WL 2076921, at *4 (E.D.N.Y. Aug. 26, 2005) (quoting *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003)); *accord Edward B. Beharry & Co. v. Bedessee Imports Inc.*, 2006 WL 3095827, at *2 (E.D.N.Y. Oct. 31 2006); *Philip Morris USA Inc. v. Felizardo*, 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004). Rather, the court "need only determine the more fundamental question of whether there are items to be confused in the first place – that is, whether the items at issue ... are, in fact, counterfeit, and whether [the] defendant ... sold those items." *Marlboro Express*, 2005 WL 2076921, at *4 (quoting *Gucci Am.*, 286 F. Supp. 2d at 287). The latter standard applies even where a sale of the counterfeit goods was never consummated. *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 455-56 (S.D.N.Y. 2005) (applying test to counterfeit cigarettes merely offered for sale).

I conclude that the well-pleaded allegations in the Complaint suffice to state a valid cause of action for either trademark infringement or false designation of origin under the Lanham Act. First, Philip Morris alleged that it owns the federally registered Marlboro Marks and has provided ample proof of the registrations. Complaint ¶¶ 7, 11-12 & Exs. A-B. Second, Philip Morris has clearly alleged facts demonstrating Sun Star's unauthorized use of its marks. *Id.* ¶¶ 17-18. Third, Philip Morris alleged that it obtained samples of the seized cigarettes and confirmed that they were indeed counterfeit Marlboro cigarettes. *Id.* ¶ 16.

Sun Star cannot avoid a finding of liability simply because CBP's seizure prevented it from selling the counterfeit goods. Both the prohibitions against infringement and false designation of origin penalize conduct involving an infringing mark's "use in commerce." 15 U.S.C. §§ 1114(1)(a); 1125(a)(1). Such use occurs when the mark is "placed in any manner on the goods or their containers ... and the goods are sold *or transported* in commerce." *Id*. § 1127 (emphasis added). Sun Star therefore used the counterfeit marks in commerce by arranging for their transport into the United States. *See Philip Morris USA Inc. v. Lee*, 481 F. Supp. 2d 742, 748 (W.D. Tex. 2006); *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 500 (C.D. Cal. 2003). Accordingly, Philip Morris has made the showing necessary to prevail on its claims of trademark infringement and false designation of origin.

With respect to the importation claim, the Lanham Act provides in relevant part that "no article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this chapter ... shall be admitted entry at any customhouse of the United States." 15 U.S.C. § 1124. Philip Morris has alleged, and Sun Star's default establishes, that the defendants imported cigarettes bearing marks identical to or

indistinguishable from its registered marks, and that those cigarettes were designated for delivery to Sun Star.  Complaint ¶¶ 14-15 & Ex. D.  Those facts suffice to establish liability.  *See Marlboro Express*, 2005 WL 2076921, at *5.  I therefore respectfully recommend that the court find Sun Star liable on each of the Complaint's first three causes of action under the Lanham Act.

b.     Tariff Act

The Tariff Act prohibits the importation of merchandise bearing a registered trademark owned by a U.S. trademark holder and recorded with CBP without the owner's written consent.  19 U.S.C. § 1526(a); *Shaw v. Rolex Watch U.S.A., Inc.*, 776 F. Supp. 128, 129 (S.D.N.Y. 1991); *Disenos Artisticos E Industriales, S.A. v. Work*, 676 F. Supp. 1254, 1271 (E.D.N.Y. 1987).  "Any person dealing in any such merchandise may be enjoined from dealing within the United States ... and shall be liable for the same damages and profits provided for wrongful use of a trademark, under [15 U.S.C. §§ 1051-1127]."  19 U.S.C. § 1526(c); *In re Houbigant Inc.*, 914 F. Supp. 964, 982 (S.D.N.Y. 1995).  Philip Morris has established that it had recorded one of the Marlboro Marks with CBP.  Complaint ¶ 13 & Ex. C.  Further, as noted above, the Complaint alleges that the defendants imported the counterfeit goods bearing the mark.  Complaint ¶¶ 14-15 & Ex. D.  I therefore respectfully recommend the court find Sun Star liable on the Complaint's fourth cause of action under the Tariff Act.

c.     Unfair Competition

Having established Sun Star's liability for trademark infringement under the Lanham Act, Philip Morris can also establish liability on its unfair competition claim under New York common law by showing that Sun Star acted in bad faith when it infringed.  *Martal Cosmetics, Ltd. v. Int'l Beauty Exchange Inc.*, 2007 WL 895697, at *22 (E.D.N.Y. Mar. 22, 2007) (citing

10

*Jeffrey Milstein v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995)); *Felizardo*, 2004 WL 1375277, at *6. Such bad faith is presumed as a result of Sun Star's use of a counterfeit mark. *Felizardo*, 2004 WL 1375277, at *6 (citing *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987)); Complaint ¶¶ 14-16. I therefore respectfully recommend that the court find Sun Star liable on the Complaint's fifth cause of action alleging unfair competition under New York common law.

d.     Trademark Infringement Under State Law

Philip Morris asserts two claims of trademark infringement under the law of New York State: the sixth cause of action asserts a claim under common law, and the eighth does so pursuant to a statute. Complaint ¶¶ 44-47, 52-54. By establishing its federal trademark infringement claim, Philip Morris has also necessarily established Sun Star's liability on the parallel claim under New York common law. *Felizardo*, 2004 WL 1375277, at *6; *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.,* 2004 WL 896952, at *7 (E.D.N.Y. Mar. 26, 2004). I therefore respectfully recommend that the court find Sun Star liable on the Complaint's sixth cause of action.

I do not reach the same conclusion on the statutory claim. The relevant statutory provision requires Philip Morris to prove that its marks were "registered under" Article 24 of the New York General Business Law, N.Y. Gen. Bus. Law § 360-k(a), which in turn requires registration with New York State. *Id*. §§ 360-a to -e. Although Philip Morris has established registration of its trademarks in the federal registry, it has neglected to plead or prove that it ever registered its marks with New York State, and as a result has failed to state a claim under the state statute. *LaPine v. Seinfeld*, 2009 WL 2902584, at *14 (S.D.N.Y. Sept. 10, 2009). I

11

therefore respectfully recommend that the court decline to grant any relief on the Complaint's eighth cause of action, and instead dismiss that count.

e.    Deceptive Business Practices

I also recommend against finding Sun Star liable on the claim that it violated New York's statutory prohibition of deceptive business practices. "[T]he majority view in this Circuit is that trademark ... infringement claims are not cognizable under [N.Y. Gen. Bus. Law § 349] unless there is a specific and substantial injury to the public interest *over and above ordinary trademark infringement*[.]" *Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.*, 2009 WL 4857605, at *8 (S.D.N.Y. Dec. 14, 2009) (internal quotation marks omitted) (emphasis in original); *accord Gross v. Bare Escentuals Beauty, Inc.*, 632 F. Supp. 2d 293, 299 (S.D.N.Y. 2008) ("Consumer confusion as to the source of the product does not create a cause of action under this statute."); *Karam Prasad, LLC v. Cache, Inc.*, 2007 WL 2438396 at *2 (S.D.N.Y. Aug. 27, 2007) (finding consumer confusion insufficient as a matter of law to establish harm to the public interest); *Tommy Hilfiger Licensing, Inc. v. Nature Labs*, LLC, 221 F. Supp. 2d 410, 413 n.2 (S.D.N.Y. 2002) ("trademark cases are outside the scope of this general consumer protection statute"); *but see Burberry Ltd. v. Euro Moda, Inc.*, 2009 WL 1675080, at *16 (S.D.N.Y. June 10, 2009) (finding sale of infringing products likely to confuse consumers as to source of origin sufficient to demonstrate injury); *GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273, 301-02 (S.D.N.Y. 2002) (finding actual consumer confusion sufficient to establish requisite injury).

In explaining the harm that Sun Star's importation of counterfeit cigarettes caused, Philip Morris alleges only that consumers purchasing the counterfeits would be confused or

disappointed, and that it would therefore suffer the loss of its "enormous goodwill" as well as sales.  Complaint ¶ 19.[3]  Such pleading as to the injury caused is conclusory and does not support a finding that Sun Star violated the deceptive business practices law.  First, under the rule followed in the majority of cases cited above, Philip Morris's claim that consumers will be confused, on its own, does not meet the threshold for liability.  Second, the assertion that Sun Star has caused Philip Morris to lose goodwill and sales must fail, since Philip Morris asserted that the cigarettes at issue were intercepted by CBP at the port of entry, Complaint ¶¶ 14-16, and it does not allege that any ever reached a consumer.  Absent a showing that the defendant's misleading conduct led to any actual harm, the asserted loss of goodwill and of sales cannot

---

[3]  To the extent "goodwill" refers to "[a] business's reputation," Black's Law Dictionary 715 (8th ed. 2004), *see also* Harry D. Nims, *The Law of Unfair Competition and Trade-Marks* 36 (1929) ("[Goodwill] is only another name for reputation, credit, honesty, fair name, reliability")), the proposition that Sun Star's conduct threatens the loss of that valuable asset is hardly unassailable. At a minimum, the proposition is in tension with the adverse factual finding that Philip Morris is one of several cigarette manufacturers that have sold "a highly addictive product which causes diseases that lead to a staggering number of deaths per year, an immeasurable amount of human suffering and economic loss, and a profound burden on our national health care system" and that, despite knowing of these harms for more than 50 years, have "marketed and sold their lethal product [to minors as well as adults] with zeal, with deception, with a single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 28 (D.D.C. 2006), *aff'd in part and vacated in part on other grounds*, 566 F.3d 1095 (D.C. Cir. 2009).  For purposes of this litigation, however, the defendants have forfeited the right to contest the continued existence of the "enormous goodwill" among smokers that Philip Morris asserts.  I therefore recommend that the court accept the assertion as true in assessing liability.

On the other hand, I conclude that the court can and should disregard Philip Morris's further allegation in the Complaint that Sun Star's acts, "including ... false and/or misleading statements regarding the quality of its products and the legality of their sale" have "resulted in injury to consumers within New York."  Complaint ¶ 49.  In the absence of any assertion or proof that any defendant made any statement at all about the quality of the counterfeit cigarettes or the legality of their sale, let alone false or misleading statements, the allegation of injury appears to be nothing more than conclusory boilerplate.

establish liability under Section 349. *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 526 (S.D.N.Y. 2009). I therefore respectfully recommend that the court decline to grant any relief on the Complaint's seventh cause of action, and instead dismiss that count.

### 2. Li

An individual who is a "moving, active[,] conscious force" behind the infringing conduct of a corporation can be held personally liable under the Lanham Act. *Bambu Sales, Inc. v. Sultana Crackers*, 683 F. Supp. 899, 913 (E.D.N.Y. 1988) (quoting *Polo Fashions, Inc. v. Branded Apparel Merch.*, 592 F. Supp. 648 (D. Mass. 1984)); *accord Bercosa*, 2009 WL 3111759, at *6; *Burberry*, 2009 WL 1675080, at *17 ("the owner of a trademark is entitled to protection against all who play a significant role in accomplishing an unlawful infringement") (internal quotation marks omitted). Demonstrating that an officer "authorized and approved the acts of unfair competition which are the basis of the corporation's liability is sufficient to subject the officer to personal liability." *Bambu Sales*, 683 F. Supp. at 913 (internal punctuation and quotation marks omitted).

However, although the law of individual liability for a corporate entity's infringement is straightforward, its applicability to this case is not. The Complaint alleges no specific facts about defendant Li aside from his status as an individual who lives in Brooklyn. Complaint ¶ 9. The factual allegations that support a finding of liability are all phrased as collective accusations about the "Defendants" – a group that includes corporate defendant Sun Star, individual defendant Li, and ten additional individuals whose "true names and capacities" Philip Morris does not know. Complaint ¶ 10; *see id.* ¶ 17 ("Upon information and belief, Defendants arranged for and imported the shipment [seized by CBP] in connection with their efforts to sell, offer for

sale, and/or distribute the Counterfeit Cigarettes[.]"); *id*. ¶ 18 ("Upon information and belief, Defendants are engaged in and/or otherwise involved in facilitating the ongoing and unrestrained commercial importation of Counterfeit Cigarettes into the United States.").  Indeed, the Complaint makes no allegation to support the proposition that Li has any connection at all to Sun Star, much less that he had any role in the conduct ascribed collectively to the "Defendants" as a group.  To the extent that the Complaint can be read liberally to imply that each factual allegation referring to the "Defendants" collectively is intended to apply individually to each, its allegations are plainly conclusory – and therefore not established by virtue of Li's default.  Accordingly, the Complaint, as currently pleaded, fails to state any cognizable claim against Li.

I nevertheless recommend that the court find Li liable for the same violations as Sun Star. In litigating this action, Philip Morris has adduced sufficient evidence, as described below, to support the inference that Sun Star is Li's alter-ego and that Li was personally involved in the company's infringing conduct.  Consequently, a decision to deny relief as to Li at this point would merely postpone the inevitable:  the only fair alternative would be to dismiss the claims against Li with leave to re-plead them by adding further allegations that already appear elsewhere in the record.  Requiring Philip Morris to do so would needlessly increase its burdens and delay the relief to which it is plainly entitled, particularly in light of the actions Li has taken thus far to obstruct any attempt to serve process on him.  Moreover, Li has had actual or constructive notice of all of the evidence in the record but has nevertheless failed to take advantage of his ample opportunity to respond to and attempt to rebut that evidence.  I therefore respectfully recommend that the court deem Philip Morris to have amended its Complaint to include the facts discussed below, and on that basis find Li liable on the first six causes of action.

Sun Star imported a commercial quantity of counterfeit cigarettes falsely designated as food products.  Pildis Dec. ¶ 11, Memo. at 17-20.  It is a fair inference that a corporate entity such as Sun Star could not and would not engage in such large-scale, illicit activity without the knowledge and authorization of someone with significant institutional authority.  The record identifies Li as the sole person who could conceivably have wielded such authority on Sun Star's behalf.  Sun Star's certificate of incorporation names Li as the sole incorporator, and it identifies no other person having any role in the company – not as an officer, member, director, incorporator, or in any other position.  DE 12 (Declaration of Sara K. Pildis in Support of Plaintiff's Motion for Leave to Conduct Discovery in Aid of Service of Process) ¶ 7 & DE 12-3.

Moreover, the bill of lading for the seized counterfeit cigarettes provided a false delivery address with no connection to Sun Star and a telephone number for a pre-paid cellular phone with no purchaser contact information.  Philip Morris has asserted that the fax number on the bill of lading was registered to AN1 and that Li terminated and disconnected this fax number almost immediately after the seizure.  Pildis Dec. ¶ 13; DE 54-6.  And while the records on which Philip Morris relies do not completely support those assertions – the fax number is associated directly with Li, rather than with AN1, and there is no evidence that the number was disconnected, let alone that Li caused that to happen – they do tend to prove that Sun Star was simply an alter-ego for Li himself.  In addition, the record establishes that AN1 owned the premises that Sun Star had designated for service of process in its certificate of incorporation, and that Li served as a "member" of AN1.  Pildis Dec. ¶¶ 12-13; DE 54-5; DE 54-6; DE 54-7; DE 12-4 at 3.[4]

---

[4]  It appears that Li personally authorized the sale of AN1's assets.  *Compare* 12-4 at 3 (Li's signature) *with* 12-4 at 7 (apparently the same signature authorizing sale of AN1 real estate).

Viewed as a whole, the circumstantial evidence in the record easily supports the inference that Li was, if not Sun Star's alter-ego, then at a minimum its principal and the "moving, active[,] conscious force behind" its infringement. *Bambu Sales*, 683 F. Supp. at 913. Accordingly, I respectfully recommend that the court find Li liable for the same violations as Sun Star.

## C. Relief

### 1. Damages

Philip Morris seeks $2,000,000 in statutory damages for the defendants' unauthorized use of its two trademarks. The Lanham Act provides that a victim of a violation of either trademark infringement or false designation of origin may recover its actual damages, the costs of the action, and in certain circumstances, the defendant's profits. 15 U.S.C. § 1117(a); *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 136, 141 (S.D.N.Y. 2000); *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 172-73 (S.D.N.Y. 2007). The statute also provides that, in a case such as this involving the use of a counterfeit mark, the plaintiff may instead elect to recover an award of statutory damages in the amount of $500 to $100,000 per counterfeit mark. 15 U.S.C.§ 117(c)(1) (2004) (amended 2008). That statutory maximum is increased to $1 million per counterfeit mark "if the court finds that the use of the counterfeit mark was willful[.]" *Id*. § 1117(c)(2) (2004) (amended 2008).[5]

---

[5] As of October 13, 2008, the statute provides for damages of $1,000 to $200,000 per counterfeit mark per type of goods or services marketed or up to more than $2,000,000 apiece for a willful violation. 15 U.S.C. § 1117(c) (2008). Because the violations at issue here occurred in 2006, I apply the law's earlier version. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 283-86 (1994).

Congress enacted the statutory damages provision of the Lanham Act to address the recurring problem that "counterfeiters' records are frequently non-existent, inadequate, or deceptively kept ... , making proving actual damages in these cases extremely difficult if not impossible." *Xiao Feng Ye*, 2007 WL 2693850 at *4 (citing *Rogers v. Anderson*, 2005 WL 950021, at *2 (S.D.N.Y. April 26, 2005)). Naturally, that problem is exacerbated where, as here, a defendant defaults, *Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999), and takes affirmative steps to evade making any disclosures. Philip Morris has thus understandably elected to seek statutory rather than actual damages, and it argues that it is entitled to a finding of willfulness that increases the cap on available statutory damages. Memo. at 10.

A defendant willfully infringes a trademark if he "'had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility.'" *Hermes Int'l v. Kiernan*, 2008 WL 4163208 at *3 (E.D.N.Y. Aug. 28, 2008) (quoting *Kepner Tregoe, Inc. v. Vroom*, 186 F.3d 283, 299 (2d Cir. 1999) (copyright case)). Here, the evidence in the record establishes that the defendants infringed the Marlboro Marks willfully. They imported 3,950 cartons of cigarettes bearing the counterfeit Marlboro Marks – equivalent to 39,500 packs or 790,000 cigarettes. Complaint ¶¶ 14-16; Memo. at 1. That quantity of counterfeit goods demonstrates an intention to sell the goods and suggests willfulness. *See Castworld Prods.*, 219 F.R.D. at 501-02 ("Where, as here, Defendant imports 8,000,000 counterfeit cigarettes, having a street value of millions of dollars, Defendant obviously knew that its conduct constituted infringement."); *see also Philip Morris USA Inc. v. ABC Chinese Food, Inc.*, 2009 WL 4067997, at *1 (E.D.N.Y. Nov. 18, 2009) (finding importation of 34,272 cartons containing 7,000,000

counterfeit cigarettes to be willful based on multiple factors but noting "[t]he quantity alone demonstrates willfulness").

Further proof of willfulness is the defendants' attempt to evade scrutiny at the time they imported the cigarettes through the use of false information in the bill of lading – describing the shipment's contents as frozen food products and providing a false destination for delivery. Pildis Dec. ¶¶ 11-13; DE 54-5; DE 54-6; DE 54-7. In addition, Li paid his lawyer to make baseless assertions of privilege to help him avoid service and subsequent discovery. Pildis Dec. ¶¶ 5-8; DE 54-3. Such an "attempt to hide ... [infringing] behavior and evade service of process underscores the willful element of [defendants'] actions." *ABC Chinese Food*, 2009 WL 4067997, at *1; *cf. Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 243-44 (2d Cir. 1994) (defendant's purposeful evasion of service evidenced willfulness of default). The combination of those factors suffices to establish willfulness here.[6]

The court has considerable discretion in determining an appropriate award of statutory damages. A conclusion that a defendant has acted wilfully merely establishes the ceiling for a

---

[6] Arguably, Philip Morris would not need to make any evidentiary showing to support its claim for damages, but could instead rely on the decisions that have held willfulness to be established by a defaulting defendant's failure to answer a complaint's allegation of willfulness. *See, e.g.*, *Century 21 Real Estate LLC v. Paramount Home Sales, Inc.*, 2007 WL 2403397, at *5 (E.D.N.Y. Aug. 20, 2007) (citing *Malletier v. WhenU.com, Inc.*, 2007 WL 257717, at *4 (S.D.N.Y. Jan. 26, 2007) (citing *Rodgers v. Anderson*, 2005 WL 950021, at *3 (S.D.N.Y. Apr. 26, 2005); *Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 124-25 (S.D.N.Y. 2003))). Such reasoning appears to be in tension with the general rule that a default suffices to establish the allegations in a pleading that relate to liability but not those that relate to damages. As explained above, the defendants' liability here is established without regard to any allegation or showing of willfulness; the latter concept is relevant only to damages and should therefore not be susceptible to proof by means of default. Fortunately, the court need not resolve the legal question because the evidence in the record – beyond the Complaint's allegations and the default – suffices to demonstrate willfulness. It is on that basis that I recommend the finding.

statutory award, but the Lanham Act otherwise provides little guidance on how to proceed in any given case. *Nike, Inc., et al. v. Top Brand Co., et al.*, 2006 WL 2946472, at *2 (S.D.N.Y. February 27, 2006); *Gucci Am.*, 315 F. Supp. 2d at 520. Courts in this jurisdiction have sought assistance when fashioning statutory damages awards from the case law construing an analogous provision of the Copyright Act, 17 U.S.C. § 504(c). *See, e.g., Xiao Feng Ye*, 2007 WL 2693850 at *4; *Nike*, 2006 WL 2946472, at *2; *Gucci Am.*, 315 F. Supp. 2d at 520; *Sara Lee*, 36 F. Supp. 2d at 166 ("The Copyright Act is not only similar in principal to the Trademark Act but identical in much of its statutory damages language."). Statutory damages awards are intended to be both compensatory and punitive. *WhenU.com*, 2007 WL 257717, at *6. Courts consider a number of factors in reaching an award, including the plaintiff's lost revenues, the infringer's profits and avoided expenses, the value of the trademark, willfulness, general and specific deterrence, and a defendant's cooperation in providing records from which to assess the value of infringing material. *Gucci Am.*, 315 F. Supp. 2d at 520; *Sarah Lee*, 36 F. Supp. 2d at 166.

Additionally, courts have taken the scope of a counterfeiting operation into account in calculating statutory damages, providing greater awards for enterprises that involve large quantities of fake goods. *See, e.g., Marlboro Express*, 2005 WL 2076921, at *6 (basing award of $1 million per mark partly on fact that defendant imported "at least 200,000 cartons and millions of cigarettes" estimated to be worth nearly $5,000,000); *Nike*, 2006 WL 2946472, at *3 (same for millions of items of counterfeit apparel); *Sara Lee*, 36 F. Supp. 2d at 169-70 (same for approximately 5,500 fake purses worth at least $230,000).

Another factor courts weigh in determining an appropriate amount of statutory damages that has relevance in this case is whether the defendants took steps to evade or frustrate fact-

finding. *See Nike*, 2006 WL 2946472, at *2 (awarding $1 million per mark partly because defendants abused discovery to conceal information about their infringing activities from plaintiffs and the court); *Sara Lee*, 36 F. Supp. 2d at 169-70 (awarding $750,000 per mark partly because defendants lied under oath and concealed evidence); *see also ABC Chinese Food*, 2009 WL 4067997, at *1 (awarding maximum statutory damages where willfulness was underscored by defendants' attempt to conceal their infringement and evade service of process).

Philip Morris seeks $1,000,000 in statutory damages per infringed trademark, for a total of $2,000,000. Memo. at 10. It makes two arguments to justify that amount. First, it asserts that several of the factors relevant to determining a statutory damages award weigh in favor of the maximum amount here. The Marlboro Marks are highly valuable, the counterfeiting here was on a large scale and would have resulted in substantial profits from the infringement, and there is a strong need to deter the defendants and their ilk from future counterfeiting. *Id.* at 14-16. Courts confronted with similar facts have awarded the maximum amount available under § 1117(c). *Id.* at 16 (citing, inter alia, *Nike*, 2006 WL 2946472, at *2-3; *Marlboro Express*, 2005 WL 2076921, at *5).

Second, Philip Morris notes that other courts have arrived at a statutory damages award by determining the "street value" of counterfeit goods and then multiplying that amount by some factor to account for the willfulness of the misconduct. Memo. at 17. Philip Morris claims that a reasonable estimate of the retail value of the seized shipment can be ascertained using New York State's statutory framework governing the pricing of cigarettes. Under this framework, one begins with the manufacturer's list price and then refers to a chart published by New York State that prescribes a minimum retail price per carton (which varies for cigarettes sold in New York

City versus those sold elsewhere in the state), and subtracts any discounts the manufacturer provided to retailers. *Id.* at 17-18 (citing *City of New York v. Golden Feather Smoke Shop, Inc.*, 2009 WL 2612345, at *6 (E.D.N.Y. Aug. 25, 2009)); Supp. Aff. at 2; DE 58-3.[7] In September 2006, at the time CBP seized Sun Star's shipment, the manufacturer's price for a carton of Marlboro cigarettes was $27.64, the minimum retail price was $64.28 within New York City (and $47.61 elsewhere), and Philip Morris offered a discount of $5.00 per carton. Supp. Aff. at 2; DE 58-3 at 6; DE 58-4 ¶ 7. Noting that Sun Star and Li are based in New York City, Philip Morris calculated the retail price per carton of cigarettes at $59.28, or a total of $234,156.00 for the entire intercepted shipment, and suggested that the court multiply that amount to account for the defendants' willfulness and to achieve a deterrent effect. Memo. at 17-20 & n.7.

In proposing an award, I begin with the principle that statutory damages are a substitute for actual damages, and should replicate as nearly as possible the actual harm done to the successful plaintiff without punishing it for lacking information on the issue due to the absent defendant's default. *Malletier v. Apex Creative Int'l Corp.*, 2010 WL 23320, at *5 (S.D.N.Y. Jan. 5, 2010); *Chanel v. Jean-Louis*, 2009 WL 4639674, at *10 (E.D.N.Y. Dec. 7, 2009).

Due to the difficulty of calculating the magnitude of reputational harm and diverted sales in many cases, courts have historically used an estimate of a defendant's profits as a rough proxy

---

[7] Philip Morris initially claimed that the minimum price for cigarettes may be calculated on a per-pack, as well as on a per-carton, basis under the New York statutory pricing scheme. Memo. at 17. In its supplemental submission, which explains the mechanics of the actual damages measure under the statute and provides evidence of the key variables in the calculation at the actual time the defendants imported the counterfeit cigarettes, Philip Morris did not describe the calculation of damages based on sales of individual packs of cigarettes and whether any manufacturer discount applies. Rather than speculate about the matter or research it on the plaintiff's behalf, I deem Philip Morris to have abandoned the per-pack method of calculating the retail value of sales of its cigarettes.

for the measure of a plaintiff's damages. *George Basch*, 968 F.2d at 1539. In estimating such

profits, Philip Morris cites the established principle that where a defendant provides no

information about its costs, the court may find the defendant's profits equal to its estimated

revenues. Memo. at 20 n.7 (citing 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be

required to prove defendant's sales only; defendant must prove all elements of cost or deduction

claimed."); *GAKM Resources LLC v. Jaylyn Sales Inc.*, 2009 WL 2150891, at *6 (S.D.N.Y. July

20, 2009) ("Any imprecision in calculating Defendants' profits is the fault of Defendants, who

failed to participate in this litigation.")). Philip Morris has established the retail price of

cigarettes in New York City, where it is reasonable to infer that Sun Star and Li – both of whom

reside in Brooklyn – would sell their counterfeit cigarettes. In the absence of any information

from the defendants that they sold their counterfeit goods for less than the mandatory retail rate

or incurred any sales costs or paid taxes, it is reasonable and appropriate to estimate their profits

as an amount equal to the expected revenues at state-mandated prices.

Philip Morris's attempt to peg its award to the retail price, however, unquestionably

exaggerates its actual harm. As an initial matter, I note that there is no evidence of *any* actual

harm: the counterfeit cigarettes about which Philip Morris complains were all intercepted. Sun

Star never sold them, never enjoyed any profits from their distribution, and never confused a

single consumer as to their origins. The exercise in which Philip Morris would have the court

engage is an estimation of the harm that Philip Morris might have suffered, or the profit that the

defendants might have reaped, if CBP had not seized the counterfeit cigarettes.[8]

---

[8] Evidence of a prior Sun Star shipment of "frozen food" (*see* Pildis Dec. ¶ 16; DE 54-5 at 10, 15) does not warrant an assumption that the shipment contained counterfeit cigarettes bearing any Philip Morris marks. Even making the apparently safe assumption that the prior shipment

Even if the court puts aside the fact that there is no evidence of any actual harm in this case and determines that Philip Morris should be compensated for the revenues it might have lost if the counterfeit cigarettes had been sold, the plaintiff's methodology of determining that loss based on the estimated retail price results in a needlessly inflated recovery. Nearly two-thirds of the state-mandated retail price consumers pay for cigarettes is collected by intermediaries in the supply chain between the manufacturer and consumer, and by city and state tax authorities – none of that portion of the sales price would go to Philip Morris. *See Golden Feather Smoke Shop*, 2009 WL 2612345, at *6 (finding taxes accounted for $30 of the retail price in late 2006 and explaining statutory markups at two stages in the supply chain between manufacturer and consumer); DE 58-3 at 6. A better method for determining the actual loss Philip Morris would have suffered would be to start with the manufacturer's price for a carton of cigarettes at the time of the seizure ($27.64), and then subtract the $5.00 per carton discount that Philip Morris was offering, resulting in a loss of net revenue of $22.64 per carton sold. Multiplying that price by the 3,950 cartons of counterfeit cigarettes that CBP seized, I conclude that the defendants' sale of the cigarettes would have caused Philip Morris to lose $89,428.00 in revenue.[9]

If Philip Morris had suffered actual harm of that magnitude, I would recommend an award of statutory damages that would not only compensate it for such harm, but also punish the

_____

concealed some form of contraband, nothing in the record provides any reason to assume that the defendants specialized in counterfeiting a single brand of cigarette.

[9] I would not conclude that the sales resulted in any compensable loss of goodwill because Philip Morris has done nothing to prove any such harm. The defendants' default establishes the alleged loss of goodwill only to the extent it is an element of liability on the deceptive business practices claim – it does not suffice for purposes of proving damages to a reasonable certainty. *See*, *e.g.*, *Finkel*, 577 F.3d at 84.

defendants' willfulness and deter future infringement.  One method for achieving such a result would be to treble the actual loss to reflect the defendants' willfulness, and then double it for the purpose of deterrence.  *See Chanel, Inc. v. Schwartz*, 2007 WL 4180615, at *8 (E.D.N.Y. Nov. 19, 2007).[10]  But where Philip Morris has not only failed to prove actual loss, but adduced evidence that affirmatively suggests that any prospective harm was averted, such an approach is ill-suited to the facts of the case.

In the past, where the evidence of infringement has shown the existence of real but very limited harm, I have recommended an award of $500.  *See Jean-Louis*, 2009 WL 4639674, at *12.  I reasoned that Congress set $500 per infringed mark as a baseline to achieve adequate compensation and deterrence in the absence of any evidence that a greater award was appropriate, and that the only increase to that base amount that could be justified was to treble it to reflect the defendants' willfulness and double the product to achieve deterrence.  *Id*.  That approach is similarly unsatisfactory here.  Although Philip Morris suffered no demonstrable harm as a result of CBP's seizure, the sheer size of the seized shipment, together with the defendants'

---

[10]  On the other hand, awarding additional multiples of that amount for multiple marks on a single infringing carton of cigarettes would appear to overcompensate.  To the extent a single counterfeit mark improperly identifies an ersatz product with its ostensible producer, the aggrieved plaintiff undoubtedly suffers some harm that arises from the likelihood that the consumer will incorrectly believe the counterfeit to be the plaintiff's product.  But that harm does not necessarily double simply because the product bears two counterfeit marks of the same producer.  To the contrary, it seems doubtful that there is any additional actual harm at all.  Moreover, such multiplication would needlessly increase both the punitive and deterrent aspects of the award:  an infringer's willful replication of a protected product does not become worse simply because the replication involves several marks rather than one; and if multiplying an award by a factor of two is deemed sufficient to deter future infringement involving a single mark, I do not understand why the same award would not also suffice to deter infringing acts involving multiple marks (which would presumably require virtually no incremental investment of effort on the part of the infringer).

attempts to conceal their infringement and Li's efforts to evade service of process, suggests the existence of a relatively large and sophisticated operation – one that will not be effectively deterred, or punished for willfulness, by an award at the bottom of the statutory range.

I therefore recommend an award of statutory damages that is significantly greater than the minimum but far below the extraordinary windfall that Philip Morris requests. Although any exercise of discretion in choosing an award in these circumstances is necessarily somewhat arbitrary, I take into account two measures that can be established with some rationality:   the $500 award that is presumptively sufficient for purposes of compensation and deterrence where no other information is available (and that I conclude is sufficient for purposes of compensation in the absence of evidence of any actual harm), and the measure of the loss that Philip Morris would have suffered but for CBP's intervention (which I conclude is an appropriate amount to deter future misconduct and punish the defendants' willfulness). Adding those two amounts together (and rounding up) produces an award of $90,000 in statutory damages. I respectfully recommend that the court award that amount to achieve the remedial goals of compensation, punishment of willfulness, and deterrence, without giving Philip Morris the benefit of an impermissible windfall.

### 2.   Abandoned Requests For Relief

Philip Morris requested additional relief in its Complaint, including:   attorneys' fees and prejudgment interest under the Lanham Act, damages and attorneys' fees under New York General Business Law §§ 349 and 360-k *et seq.*, and general and special damages under New York State common law. Complaint at 14 (prayer for relief ¶ C(iii)-(v)). When Philip Morris served its default motion papers on Sun Star, however, it included a proposed Default Judgment

that omitted any mention of these other forms of relief. DE 54-12. As a result, Sun Star may have made the decision not to contest the motion in reliance on the relief set forth in the judgment that Philip Morris asked the court to enter. For that reason, I recommend against any award that exceeds the terms of the proposed Default Judgment. *See Am. Home Mortgage Corp. v. America's Choice Mktg., Inc.*, 2008 WL 919598, at *4 (E.D.N.Y. Mar. 20, 2008) (deeming abandoned a claim for attorneys' fees included in complaint but omitted from proposed default judgment); *see also Trs. of Plumbers Local Union No. 1 Welfare Fund, Add'l Sec. Benefit Fund, Vacation & Holiday Fund, Trade Educ. Fund and 401(k) Savs. Plan v. Generation II Plumbing & Heating, Inc.*, 2009 WL 3188303, at *3 n.1 (E.D.N.Y. Oct. 1, 2009) (same for claims for contributions and court-ordered audit included in complaint but omitted from default motion). However, to allow for a full review by the court in the event any party objects to this Report and Recommendation, I also include in the discussion below an analysis of each type of relief that might otherwise be available but for its omission from the proposed Default Judgment.

a.  Attorneys' Fees

Although the Lanham Act clearly provides for an award of attorneys' fees in conjunction with actual damages, courts in this circuit have not always agreed whether attorneys' fees are appropriate where the plaintiff elects instead to collect an award of statutory damages. *Martal Cosmetics*, 2007 WL 895697, at *36 (collecting cases). "Nonetheless, most courts have awarded attorneys' fees in addition to awarding statutory damages under § 1117(c)." *Id.* A court may also award attorneys' fees under New York State law where the defendant willfully infringed the plaintiff's trademark. N.Y. Gen. Bus. Law §§ 349(h), 360-m; *Centaur Commc'ns*, 652 F. Supp. at 1114-15.

Philip Morris having submitted a proposed Default Judgment that makes no mention of any award of attorneys' fees, the court should award no such fees to avoid unfair surprise to Sun Star. Even if the court disagrees, Philip Morris would not be entitled to an award of attorneys' fees for the further reason that it submitted no supporting documentation on which such an award could be calculated. A party seeking attorneys' fees bears the burden of submitting evidence that provides a factual basis for a fee award, *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983), which should include records that detail "for each attorney, the date, the hours expended and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). Where, as here, an application lacks such information, the application "should normally be disallowed." *Id.* at 1154; *Garden City Boxing Club, Inc. v. Conway*, 2009 WL 125434, at *5 (S.D.N.Y. Jan. 20, 2009) (declining to award attorneys' fees in default where plaintiff submitted no evidence of such fees). For those reasons, I respectfully recommend that the court award no attorneys' fees.

### b.    Prejudgment Interest

Philip Morris has submitted a proposed Default Judgment that makes no mention of any award of prejudgment interest. For that reason alone, the court should award no such interest to avoid unfair surprise to the defendants. In the event the court disagrees, I conclude that an award of interest should be available to Philip Morris on request. Prejudgment interest is available under the Lanham Act, although it is usually awarded in conjunction with an award of actual damages under § 1117(a). *See* 15 U.S.C. § 1117(b) (providing for prejudgment interest in infringement cases that involve "assessing damages under [1117(a)]]"); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 2009 WL 5185808, at *10 (E.D.N.Y. Dec.

23, 2009).  However, this court has also found prejudgment interest to be an appropriate component of the remedy provided to a plaintiff seeking an award of statutory damages under § 1117(c).  *Johnson & Johnson Consumer Cos. v. Aini*, 540 F. Supp. 2d 374, 396-97 (E.D.N.Y. 2008).

In any event, while such awards are authorized, they are discretionary and are reserved for "'exceptional' cases."  *Am. Honda Motor Co., Inc. v. Two Wheel Corp.,* 918 F.2d 1060, 1064 (2d Cir. 1990).  Some courts have deemed a case "exceptional" and awarded prejudgment interest on the basis that a defendant committed infringement willfully.  *See, e.g.*, *Nat'l Ass'n for Specialty Food Trade, Inc. v. Construct Data Verlag AG*,2006 WL 5804603, at *7 (S.D.N.Y. Dec. 11, 2006); *GTFM*, 215 F. Supp. 2d at 307.  Others have declined to find a case sufficiently "exceptional" to justify prejudgment interest solely on the basis of the defendant's willfulness or bad faith.  *See, e.g.*, *Gidatex*, 82 F. Supp. 2d at 147-48, 151.  The court need not resolve that conflict, since Sun Star and Li not only acted willfully, but Li's attempts to frustrate the judicial process make the case exceptional.  *Cf. Sara Lee,* 36 F. Supp. 2d at 170 (finding case "exceptional," for award of attorneys' fees, where it involved "not only willful infringement, but also willful defiance and protraction of judicial processes attempting to stop the illegalities").

An award of prejudgment interest on a plaintiff's damages award may be calculated at a statutorily prescribed interest rate "beginning on the date of the service of the claimant's pleadings setting forth the claim for such entry of judgment and ending on the date such entry is made, or for such shorter time as the court considers appropriate."  15 U.S.C. § 1117(b) (referring to 26 U.S.C. § 6621(a)(2)).  Under the relevant provision, the annual interest rate equals the federal short-term interest rate plus three percentage points.  26 U.S.C. § 6621(a)(2).  Since

January 8, 2008, when Philip Morris served the Complaint on Sun Star, *see* DE 35, the short-term rate has ranged from four percent to seven percent. IRC 6621(a)(2) Underpayment Rates Table, http://www.dol.gov/ebsa/calculator/a2underpaymentrates.html. I find an average short-term rate of six percent to be reasonable. *See Koon Chun*, 2009 WL 5185808, at *10 (selecting rate from range of federal short-term rates for applicable period). Adding three percentage points to that total produces an annual statutory interest rate of nine percent. Applying that rate to the recommended statutory damages award of $90,000 for the period of two years and 82 days between service of the Complaint on Sun Star on January 8, 2008, and March 31, 2010 (which I estimate to be the earliest likely date for the entry of judgment) results in a total of $18,019.73 in interest.[11] Accordingly, in the event the court disagrees with my recommendation to deny an award of prejudgment interest, I respectfully recommend an interest award in that amount.

c.      General and Special Damages

In the Complaint, Philip Morris sought an award of general and special damages under New York common law. Complaint at 14 (prayer for relief ¶ C(v)). Its proposed Default Judgment makes no mention of these damages, however. On that basis alone, the court should award no such damages. Such an award is also inappropriate for the further reason that "[p]laintiffs are not entitled to duplicative recoveries for the same intellectual property theft under multiple theories of liability." *Tu v. TAD Sys. Tech. Inc.*, 2009 WL 2905780, at *4 (E.D.N.Y. Sept. 10, 2009) (citing *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1997) ("A plaintiff seeking compensation for the same injury under different legal theories is of

---

[11]  I recommend against awarding interest on any award of attorneys' fees or costs. *See Koon Chun*, 2009 WL 5185808, at *10.

course entitled to only one recovery.")).  Here, any general and special damages Philip Morris might claim on its state law claims would be "coextensive" with, and thus duplicative of, the statutory damages award under the Lanham Act, all of which spring from the same infringement.  *Cf. Tu*, 2009 WL 2905780, at *4 (finding claims under multiple federal statutes duplicative).  I therefore respectfully recommend that the court award no special or general damages under state common law.

        3.    <u>Costs</u>

Philip Morris also requested an award of litigation costs under the Lanham Act.  Complaint at 14 (prayer for relief ¶ D); Memo. at 24-25; *see* 15 U.S.C. § 1117(a).  Having established the defendants' liability, Philip Morris is entitled to recover its litigation costs "subject to the principles of equity even without the higher showing of willfulness that justifies attorney[s'] fees."  *Sara Lee*, 36 F. Supp. 2d at 170-71 (internal quotation marks omitted).  Here, Philip Morris has elected to seek recovery under § 1117(c), which contains no provision entitling a plaintiff to an award of costs.  The issue of its right to collect such costs is thus analogous to the issue of its right to collect attorneys' fees under § 1117(c).  For the same reasons I concluded that the Lanham Act does permit a plaintiff to recover attorneys' fees in conjunction with a statutory award, I find that it permits recovery of litigation costs under § 1117(c).  *See, e.g.*, *Tiffany*, 282 F. Supp. 2d at 125 (awarding costs on top of statutory damages); *Rolex Watch U.S.A., Inc. v. Jones*, 2002 WL 596354, at *6 (S.D.N.Y. Apr. 17, 2002) (same); *Sara Lee*, 36 F. Supp. 2d at 170-71 (same).  Philip Morris seeks reimbursement of the $350 filing fee it paid to begin the litigation, Memo. at 24-25, a cost that is conclusively established on the docket.  DE 1.  I therefore respectfully recommend that the court award $350 in costs.

4.     Injunctive Relief

Philip Morris asks the court to issue a permanent injunction barring further infringement of its intellectual property.  Specifically, it seeks to enjoin the defendants and any surrogates from:  importing or trafficking in counterfeit cigarettes bearing any trademarks owned by Philip Morris, including the Marlboro Marks; aiding or abetting any person or entity in such conduct; and using the Marlboro Marks or trademarks confusingly similar to those marks or Marlboro trade dress or trade dress confusingly similar to Marlboro trade dress.  DE 54-12 ¶ 10.  The Lanham Act provides for the requested injunctive relief, "according to the principles of equity and upon such terms as the court may deem reasonable to prevent the violation of ... [the Act.]" 15 U.S.C. § 1116(a).[12]  An injunction is warranted where a party has succeeded on the merits, there is an absence of an adequate remedy at law, and an injunction is necessary to prevent irreparable harm.  *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).

I pause to address the portion of the requested injunction that relates to trade dress infringement.  Trade dress "encompasses the overall design and appearance that make the product identifiable to consumers."  *Nora Beverages v. Perrier Group of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001).  To establish liability for trade dress infringement under the Lanham Act, a plaintiff must prove that:  its trade dress is not functional; its trade dress is either inherently distinctive or has acquired a secondary meaning in the marketplace; and there is a likelihood of

---

[12]  Philip Morris also seeks injunctive relief under the Tariff Act and under New York statute and state common law.  Complaint ¶¶ 25, 30, 35, 40, 43, 47, 51, 55.  Those sources of authority do provide other bases on which a court may issue an injunction.  19 U.S.C. § 1526(c); N.Y. Gen. Bus. Law §§ 349(h), 360-m; *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 364 (S.D.N.Y. 1998) ("Plaintiffs have satisfied their burden to show unfair competition under both the Lanham Act and New York [common] law, and this further entitles them to the remedy of injunctive relief.").

confusion between its trade dress and that of the defendant.  *Id.* at 118-119.  Philip Morris has

not proved that the defendants infringed its trade dress; indeed, Philip Morris has not even

alleged any facts related to the functionality, distinctiveness, or secondary meaning of its trade

dress.  Having never claimed such infringement, let alone succeeded on such a claim, I conclude

that Philip Morris is not entitled to any injunction related to trade dress.

By contrast, Philip Morris has succeeded on the merits of its Lanham Act claims related

to trademark infringement and false designation of origin, thus it is entitled to an injunction

against further violations of those kinds if it demonstrates that such relief is necessary to avoid

irreparable harm and that it has no adequate remedy at law.  I conclude that Philip Morris has

made that showing.  Irreparable injury in trademark cases is established where "there is any

likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or

indeed simply confused, as to the source" of the goods in question.  *Lobo Enters., Inc. v. Tunnel,*

*Inc.*, 822 F.2d 331, 333 (2d Cir. 1987) (internal quotation marks and citations omitted); *see also*

*Philip Morris USA Inc. v. A & V Minimarket, Inc.*, 592 F. Supp. 2d 669, 675 (S.D.N.Y. 2009)

holding that "proof of a likelihood of confusion establishes ... irreparable harm." (quoting

*Brennan's Inc. v. Brennan's Rest.*, 360 F.3d 125, 129 (2d Cir. 2004)); *Marlboro Express*, 2005

WL 2076921, at *5 (same).

As explained above, Philip Morris has established that the defendants' continued

infringement of the Marlboro Marks is likely to mislead consumers as to the authenticity of

imported counterfeit cigarettes.  *A & V Minimarket*, 592 F. Supp. 2d at 675; *Marlboro Express*,

2005 WL 2076921, at *7 (awarding permanent injunction "[g]iven the risk of irreparable harm

caused by default defendants' continued sale of counterfeit Marlboro brand cigarettes").  Philip

Morris has also established that it has no adequate remedy at law. Such a remedy exists if an injured party can be compensated by a monetary damages award. *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991). However, in cases where confusion about the origin of goods leads to damage to reputation or loss of a potential relationship with a customer that "would produce an indeterminate amount of business in years to come[,]" monetary damages are difficult to establish and are unlikely to present an adequate remedy at law. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)). If the defendants are not prevented from continuing to import counterfeit cigarettes branded with the Marlboro Marks, they may adversely affect the reputation and business of Philip Morris in ways that may be difficult to quantify and that will not lend themselves easily to monetary compensation. I therefore respectfully recommend that the court permanently enjoin the defendants from using the Marlboro Marks or any other marks owned by Philip Morris, or from aiding or abetting anyone else to do so.[13]

III.    Recommendation

For the reasons set forth above, I respectfully recommend that the court grant the plaintiff's motion and enter judgment finding defendants U.S. Sun Star Trading, Inc. and An Long Li jointly and severally liable to Philip Morris on the Complaint's first six causes of action

---

[13] If Philip Morris sought to enjoin nothing more than the kind of conduct that the law already forbids, I would recommend against an injunction on the ground that the request is moot. *See DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974) ("'federal courts are without power to decide questions that cannot affect the rights of litigants ... before them'") (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). The request at issue goes farther, however, by seeking to enjoin the defendants not only from direct acts of infringement but also from any conduct that would aid infringement. DE 54-12 ¶ 10. Because the Lanham Act itself does not bar such assistance, *see Elec. Lab. Supply Co., Inc. v. Cullen*, 977 F.2d 798, 806-07 (3d Cir. 1992), the instant request for injunctive relief is not moot.

in the total amount of $90,350 (consisting of $90,000 in statutory damages and $350 in costs) and that it issue a permanent injunction; I further recommend that the court deny the remainder of the motion and dismiss the Complaint's seventh and eighth causes of action, alleging state law statutory claims of deceptive business practices and trademark infringement.

IV.    Objections

I direct the plaintiff to serve a copy of this Report and Recommendation on defendant Sun Star by certified mail, and to file proof of such service no later than March 15, 2010; in light of the difficulties associated with past attempts to serve defendant Li, I will not require the plaintiff to attempt further service on him.  Any objections to this Report and Recommendation must be filed no later than March 29, 2010.  Failure to file objections within this period designating the particular issues to be reviewed  waives the right to appeal the court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2);  *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, --- F.3d ----, 2010 WL 547526, at *7 (2d Cir. Feb. 18, 2010).

**SO ORDERED.**

Dated: Brooklyn, New York
       March 11, 2010

                                        /s/ James Orenstein
                                        JAMES ORENSTEIN
                                        U.S. Magistrate Judge